# IN THE DISTRICT COURT OF THE UNITED STATES

## for the Western District of New York

_____

| | |
|---|---|
| | **JULY 2020 GRAND JURY**<br>**(Impaneled July 31, 2020)** |
| **THE UNITED STATES OF AMERICA** | **INDICTMENT** |
| *-vs-* | **Violations:** |
| **MICHAEL W. LUEHRSEN** | Title 18, United States Code,<br>Sections 1349, 1956(a)(1)(B)(i),<br>1957(a), 1512(c)(1), and 1519<br>(22 Counts and 2 Forfeiture Allegations) |

## INTRODUCTION

### The Grand Jury Charges That:

At all times relevant to this Indictment:

### A.  Relevant Individuals, Entities, and Financial Institutions

1.  The defendant, MICHAEL W. LUEHRSEN ("LUEHRSEN"), was the owner of MedHype Typ, LLC ("MedHype").  Prior to owning MedHype, LUEHRSEN was a pharmaceutical sales representative.

2.  MedHype was a New York limited liability company through which LUEHRSEN marketed compounded medications.

3.     First Niagara Bank ("FNB") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. FNB was headquartered in Buffalo, New York, and maintained branch locations throughout the Western District of New York.  Between at least in or about May 2014 and in or about September 2016, MedHype held an account at FNB including, but not limited to, an account ending in 0812 ("FNB 0812").  LUEHRSEN was the sole signatory of FNB 0812.  FNB was acquired by Key Bank and, thereafter, FNB 0812 transitioned to a Key Bank account ending in 1781.  The location of the First Niagara Bank branch at which this account was opened was in the Western District of New York.

4.     Between at least in or about 2013 and in or about September 2016, LUEHRSEN held accounts at FNB including, but not limited to, accounts ending in 5221, 1996, 0178, 9213, 9247, 4444, 0146, 0369, 4147, 4162, 6282, 6290, 6324, 6944, 6951, 6969, 9363, 9371, 7058, 7116, 7124, 7132, 7140, 1259, 1267, 1275 and 2186.  LUERHSEN was the only authorized signer for each of these accounts.

5.     Key Bank ("Key") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. Key was headquartered in Cleveland, Ohio, and maintained branch locations throughout the Western District of New York. Between at least in or about September 2016 and in or about August 2017, MedHype held an account at Key, including, but not limited to, an account ending in 1781 ("Key 1781").  LUEHRSEN was the sole

signatory of Key 1781. The Key Bank branch at which this account was opened was in the Western District of New York.

6.      Between at least in or about September 2016 and in or about August 2017, LUEHRSEN held accounts at Key, including but not limited to accounts ending in 4006, 0475 and 1027 ("Key 4006," "Key 0475" and "Key 1027"). LUEHRSEN was the sole signatory of Key 1027, Key 0475, and Key 4006.  The Key Bank branch at which each of these accounts was opened was in the Western District of New York.

7.      Bank of America ("BOA") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. BOA was headquartered in Charlotte, North Carolina, and maintained branch locations throughout the Western District of New York.  Between at least in or about November 2014 and in or about December 2016, MedHype held an account at BOA, including, but not limited to, an account ending in 9865 ("BOA 9865"). LUEHRSEN was the sole signatory of BOA 9865.  The Bank of America branch at which this account was opened was in the Western District of New York.

8.      Charles Schwab Corporation was a financial institution within the meaning of Title 18, United States Code, Section 20.  Charles Schwab Corporation was headquartered in San Francisco, California, and maintained branch locations throughout the Western District of New York.  Charles Schwab & Co. and Charles Schwab Bank were subsidiaries of Charles Schwab Corporation.  Between at least in or about January 2015 through at least in or about

October 2020, LUEHRSEN held accounts at Charles Schwab & Co. and Charles Schwab Bank, including, but not limited to, accounts ending in 5465, 1602, 7759, 9808, 2312 and 3971. LUEHRSEN was the only authorized signer on Schwab Accounts 5465, 1602, 7759, 9808, 2312 and 3971.

9.    A "health care benefit program," as defined in Title 18, United States Code, Section 24(b), was any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service was provided to any individual, including any individual or entity who was providing a medical benefit, item, or service for which payment may be made under the plan or contract.

**B.    The Reimbursement Process for Compounded Medications**

10.    In general, "compounded medications" were drugs created by combining, mixing, or altering ingredients to create a medication that was tailored to the medical needs of an individual patient.  For example, if a patient was allergic to a specific ingredient in a Food and Drug Administration-approved medication, a compounded drug could be prepared for the patient.  Compounded medications were not approved by the Food and Drug Administration.

11.    The insurance programs provided by Blue Cross and Blue Shield of Western New York, d/b/a HealthNow ("BCBS"), and the prescription coverage provided by the Verizon Medical Expense Plan for New York and New England Associates ("Verizon"),

National Grid USA, and Sunovion Pharmaceuticals Inc. ("Sunovion") were "health care benefit programs," as that term is defined in Title 18, United States Code, Section 24(b).

12.    The health care benefit programs identified above provided coverage for compounded medications to eligible beneficiaries and members.  Each health care benefit program's pharmacy program was administered by a Pharmacy Benefit Manager ("PBM"), whose responsibilities included adjudicating and processing payment for prescription drug claims submitted by pharmacies.  PBMs also conducted audits to ensure compliance with rules and regulations.  As is relevant to this Indictment, CVS Caremark was a PBM that provided pharmacy management services to National Grid USA, and  Express Scripts was a PBM that provided pharmacy management services to BCBS, Verizon, and Sunovion.

13.    Upon receiving prescriptions, pharmacies submitted claims for dispensing prescription drugs to health care benefit programs or PBMs.  Health care benefit programs or PBMs reimbursed pharmacies at specified rates.  As it relates to compounded medications, reimbursement rates were generally based on the compound's formulation.  As it relates to the conspiracy alleged in this Indictment, after a health care benefit program or PBM reimbursed a pharmacy for a compounded medication prescription, the pharmacy generally kept half of the reimbursement for itself and paid the other half to the company or entity that had helped obtain the prescription.

## COUNT 1

### (Conspiracy to Commit Health Care Fraud)

### The Grand Jury Further Charges That:

1.      The allegations of the Introduction of this Indictment are realleged and incorporated by reference as though fully set forth herein.


2.      Beginning in or around February 2014 and continuing to on or about December 31, 2016, the exact dates being unknown to the Grand Jury, in the Western District of New York, and elsewhere, the defendant, MICHAEL W. LUEHRSEN ("LUEHRSEN"), did knowingly, willfully, and unlawfully combine, conspire, and agree with others, known and unknown to the Grand Jury, to knowingly and willfully execute a scheme and artifice to defraud and to obtain, by means of false and fraudulent pretenses, representations and promises, money owned by and under the custody and control of BCBS and the prescription coverage provided by Verizon, National Grid USA, and Sunovion, each a health care benefit program, in connection with the delivery of, and payment for, health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.


### PURPOSE OF THE CONSPIRACY

3.      It was the purpose of the conspiracy for the defendant, MICHAEL W. LUEHRSEN, and his associates, to unjustly enrich themselves by marketing, and obtaining prescriptions for, compounded medications in a manner fraudulently intended to continually maximize both the reimbursement rate and the adjudication rate of the compounded medications.

## MANNER AND MEANS BY WHICH
## THE CONSPIRACY WAS ACCOMPLISHED

4.      In furtherance of the conspiracy, the defendant, MICHAEL W. LUEHRSEN, through MedHype, and together with others, known and unknown, marketed compounded medications.  The compounded medications marketed by LUEHRSEN and his associates included creams and patches that were marketed as treatments for pain, scars, and wounds.

5.      Unlike typical pharmaceutical sales representatives who marketed prescription drugs to physicians, LUEHRSEN and other members of the conspiracy typically targeted patients whose health insurance covered compounded medications and marketed the medications directly to those patients.  In most cases, members of the conspiracy then assisted the patients in obtaining prescriptions for the compounded medications.  After a health care benefit program or PBM reimbursed a pharmacy for a compounded medication prescription that a MedHype representative had helped obtain, the pharmacy generally kept half of the reimbursement for itself and paid the other half to MedHype.

6.      The compounded medications marketed by LUEHRSEN typically carried substantial reimbursement rates.  For example, Patient 1, a person whose identity is known to the Grand Jury, received, on a monthly basis, several different compounded medications pursuant to several different MedHype-marketed prescriptions.  Although the number of prescriptions and the reimbursement rate for Patient 1's prescriptions changed over time, the average monthly reimbursement rate for all of Patient 1's compounded medication prescriptions, from January 2015 through December 2016, was more than $16,000 per compounded medication.

7.    In furtherance of the conspiracy, after Patient 1 began receiving compounded prescriptions, LUEHRSEN encouraged Coconspirator 2, a person known to the Grand Jury, to obtain compounded medication prescriptions for members of Patient 1's family who were also covered by Patient 1's health care benefit program.    Patient 1 began receiving compounded medications, with monthly refills, from approximately January 2015 through approximately December 2016.  Patient 1's three children also began receiving compounded medications, with monthly refills, from approximately April 2015 through various dates in 2016.  In total, these prescriptions and refills for Patient 1 and Patient 1's children resulted in reimbursement of approximately $2.819 million.

8.    In furtherance of the conspiracy, LUEHRSEN obtained a large number of high-reimbursement compounded medications for himself.  Beginning in or around February 2014 and continuing through on or about March 24, 2015, LUEHRSEN received compounded medications purportedly prescribed by Physician 1 and Physician 2, medical doctors whose identities are known to the Grand Jury, resulting in total reimbursement of approximately $326,639.  Many of those prescriptions were filled on the same day that other compounded medication prescriptions, prescribed for LUEHRSEN by another physician, were also filled.  For example, on or about August 13, 2014, four compounded medication prescriptions purportedly prescribed by Physician 1 for LUERHSEN were filled; on or about that same date, three additional compounded medication prescriptions, purportedly prescribed by Physician 2 for LUEHRSEN, were also filled.  Similar prescription activity occurred in May, June, July, and September 2014.

9.      In furtherance of the conspiracy, LUEHRSEN recruited other individuals to join the conspiracy as representatives. In doing so, LUEHRSEN trained, paid, and communicated with those representatives. LUEHRSEN routinely paid the representatives a percentage of the reimbursement that MedHype received for each prescription the representative marketed which was approved and filled.

10.      In furtherance of the conspiracy, LUEHRSEN encouraged other members of the conspiracy to obtain compounded medications for themselves and members of their family.

11.      In furtherance of the conspiracy, LUEHRSEN and other members of the conspiracy obtained "dummy" scripts to learn whether a particular health care benefit program would cover compounded medications.

12.      In furtherance of the conspiracy, the compounded medications marketed as part of the conspiracy were not tailored to the needs of individual patients, but were, instead, tailored to contain ingredients which carried high reimbursement rates from health care benefit programs.  These compounded medications were typically listed on pre-printed, check-the-box prescription pads, which were made available to prescribing doctors.  When PBMs did not adjudicate particular compounded medications, the formulations of these compounded medications were modified to ensure that the PBMs would continue to adjudicate the medications and to maximize reimbursement rates for the compounded

medications.   As LUEHRSEN described the process in an April 9, 2014, email to Coconspirator 1, adjudication had "become[] more of a game of cat and mouse."  These changes required members of the conspiracy to provide physicians with new, updated pre-printed prescription forms containing new formulations and products.

13.    Through his emails, LUEHRSEN encouraged MedHype representatives to market compounded medication formulations and products that had been chosen or reformulated with the goal of maximizing reimbursement and adjudication rates for the prescriptions.  For example:

   a.  In an April 9, 2014, email to Coconspirator 1, LUEHRSEN wrote:

> We are introducing a new PM Pain Patch into the PPO formulary. We have high expectations for the product to increase the overall adjudication rate. For number 30s it carries a reimbursement rate of $1,100.00, and number 60s $2,200.00.  As adjudication becomes more of a game of cat and mouse, with 45% of compound being denied by major Carries/Payors, adding the PM Pain Patch to our current formularies will help increase adjudication rates across the board. PM Pain Patch is prescribed for continuing/on-going treatment.  Most physician's [sic] will prescribe both compounds for the day, PM Pain Patch for the evening for synergetic reaction.
>
> Please add out [sic] EFax number to the top.

   b.  In a September 12, 2014, email to Coconspirator 1 and Coconspirator 2, LUERHSEN wrote:

> New one from [Physician 3]…going to have to re do, the box for the patches aren't checked…

c.  In a June 25, 2015, email to Coconspirator 1, LUEHRSEN wrote:

> Use this pad going forward for creams/vitamins . . . . fax # is same 1-888-[xxx-xxxx].
>
> Each patient can get 3 products each . . .
>
> Highest paying are the following in this order . . .
> Wound
> Scar
> Pain
> Metabolic
>
> I have been doing the 3 creams.
>
> Let me know if you any questions.

d.  In an April 14, 2016, email, LUEHRSEN wrote:

> Attached you will find a new script pad with some new additional great products! You will also recognize a change to the diclo product, the diclo 1.5% is no longer reimbursing at a high dollar amount.  I would recommend getting these new script pads in your offices ASAP with the new diclo product so that you are able to maximize your reimbursements.
>
> Please let me know if any questions.

e.  In a May 3, 2016, email to Coconspirator 1, LUEHRSEN wrote:

> Attached is the new script pad with the new products mentioned on last weeks [sic] call. You will see a major increase in adjudications with these new products.

f.  In a July 18, 2016, email to Coconspirator 1, LUEHRSEN wrote:

> Attached you will find the new script pad, with the new pain patches.  I would get these in your doctors [sic] offices ASAP. I would imagine this product will be covered for about 3-4 months.

11

14.     In furtherance of the conspiracy, LUEHRSEN, together with his associates, obtained compounded medication prescriptions from physicians who had never examined, and who had no doctor-physician relationship with, the patients for whom they prescribed medications.  For example, Physician 3, a medical doctor whose identity is known to the Grand Jury, signed approximately 147 compounded medication prescriptions for 19 patients. These prescriptions were filled approximately 519 times, resulting in more than $8.75 million in reimbursement being paid by the prescription coverage provided by National Grid USA, BCBS, and Verizon Medical Expense Plan for New York and New England Associates. Physician 3 signed those prescriptions after receiving pre-completed prescription forms from MedHype representatives.  Physician 3 examined only two of those patients before signing prescriptions.

15.     In furtherance of the conspiracy, and to conceal the fact that that many patients had not seen a physician prior to receiving a compounded medication, LUEHRSEN instructed members of the conspiracy on how patients and physicians should respond to audits by PBMs concerning compounded medication prescriptions.

16.     During and in furtherance of the conspiracy, and to conceal the conspiracy's existence and operations from detection, LUEHRSEN deleted and destroyed, and instructed other members of the conspiracy to delete and destroy, emails, text messages, and other records concerning MedHype and the marketing of compounded medications.

17.     During and in furtherance of the conspiracy, from in or about May 2014 to in

or about October 2020, to conceal the conspiracy's proceeds from detection, LUEHRSEN caused monetary and financial transactions, specifically, money deposited in the MedHype bank accounts held at FNB Account 0812, Key Account 1781, and BOA Account 9865, to be circulated between 28 personal bank accounts held by LUEHRSEN. Thereafter, LUEHRSEN utilized the funds containing proceeds of health care fraud to fund investment accounts at Charles Schwab & Company Inc., to purchase real properties, and to fund private equity investments.

**All in violation of Title 18, United States Code, Section 1349.**

## COUNTS 2 – 9

### (Money Laundering)

**The Grand Jury Further Charges That:**

1.      The allegations of the Introduction and Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates set forth below, in the Western District of New York, and elsewhere, the defendant, MICHAEL W. LUEHRSEN, did knowingly conduct the financial transactions set forth below by, through, and to financial institutions engaged in, and the activities of which affected, interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is, health care fraud in violation of Title 18 United States Code, Section 1347, and conspiracy to commit health care fraud in violation of Title 18, United States Code, Section 1349, knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and

the control of the proceeds of specified unlawful activity, and that while conducting such financial transactions, the defendant, MICHAEL W. LUEHRSEN, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity:

| COUNT | DATE OF TRANSACTION | DESCRIPTION OF TRANSACTION |
|-------|---------------------|----------------------------|
| 2 | August 12, 2016 | Check 1189 in the amount of $500,000 issued from FNB Account 0812 and made payable to Charles Schwab & Co. and deposited into Schwab Account 2312. |
| 3 | September 6, 2016 | Check 1190 made payable to Charles Schwab & Co. issued in the amount of $500,000 from FNB Account 0182 to Schwab Account 2312. |
| 4 | December 19, 2016 | Wire transfer in the amount of $287,440.48 from Key Account 0475 to Northwest Savings Bank Account 0827 to pay off the remaining mortgage loan balance associated with Unit 601 in The Pasquale located at 132 Lakefront, Buffalo, New York 14202. |
| 5 | January 6, 2017 | Check 101 in the amount of $500,000 drawn on Schwab 2312 and made payable to Quality Product Solution LLC for the acquisition of the Promissory Note and deposited into BOA Account 4925 in the name of Quality Product Solutions LLC. |

| COUNT | DATE OF TRANSACTION | DESCRIPTION OF TRANSACTION |
|-------|--------------------|-----------------------------|
| 6 | March 14, 2017 | Wire transfer in the amount of $450,000 from Key Account 1027 to Cutaia Acquisitions LLC, Citizens Bank Account 2083 for the acquisition of 50 membership units in Monterra Holdings, LLC. |
| 7 | December 29, 2017 | Wire transfer in the amount of $662,882.67 issued from the pledged asset line attached to Schwab Bank Account 5465 to Focus Title Group, LLC Trust, Branch Banking & Trust Company Account 8313 for the purchase of 1201 20th Street Unit 209, Miami Beach, Florida 33139. |
| 8 | December 29, 2017 | Wire transfer in the amount of $245,000 issued from Schwab Account 7759 to Focus Title Group, LLC Trust, Branch Banking & Trust Company Account 8313 for the purchase of 1201 20th Street Unit 209, Miami Beach, Florida 33139. |
| 9 | January 12, 2018 | Account transfer in the amount of $245,000 from Schwab Account 2312 to Schwab IRA Account 7759. |

**All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).**

## COUNTS 10 - 20

**(Money Laundering)**

**The Grand Jury Further Charges That:**

1.       The allegations of the Introduction and Count 1 are realleged and incorporated by reference as though fully set forth herein.

15

2.      On or about the dates set forth below, in the Western District of New York, and elsewhere, the defendant, MICHAEL W. LUEHRSEN did knowingly engage in monetary transactions, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, the deposit, withdrawal, transfer and exchange of funds and monetary instruments by, through and to financial institutions engaged in, and the activities of which affected, interstate and foreign commerce, such property having been derived from specified unlawful activity, that is, health care fraud in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care fraud in violation of Title 18, United States Code, Section 1349, and knowing that the funds and monetary instruments involved in the transactions constituted, and were derived from, proceeds obtained from a criminal offense.

| COUNT | DATE OF TRANSACTION | AMOUNT | DESCRIPTION OF TRANSACTION |
|---|---|---|---|
| **10** | August 12, 2016 | $500,000 | Check 1189 in the amount of $500,000 issued from FNB Account 0812 and made payable to Charles Schwab & Co. and deposited into Schwab Account 2312. |
| **11** | August 15, 2016 | $100,000 | Account transfer in the amount of $100,000 from FNB Account 1259 to FNB Account 0812. |

| COUNT | DATE OF TRANSACTION | AMOUNT | DESCRIPTION OF TRANSACTION |
|---|---|---|---|
| 12 | August 22, 2016 | $380,000 | Check 1151 issued from BOA Account 9865 made payable to Quality Product Solutions LLC for the acquisition of a 10% Class A Interest in Quality Product Solutions LLC. |
| 13 | August 31, 2016 | $130,000 | Account transfer from FNB Account 0812 to FNB Account 1267. |
| 14 | September 6, 2016 | $500,000 | Check 1190 made payable to Charles Schwab & Co. issued in the amount of $500,000 from FNB Account 0182 to Schwab Account 2312. |
| 15 | September 29, 2016 | $128,000 | Check 1159 issued from BOA Account 9865 made payable to Mike Luehrsen and deposited in Key Account 4006. |
| 16 | December 19, 2016 | $287,440.48 | Wire transfer in the amount of $287,440.48 from Key Account 0475 to Northwest Savings Bank Account 0827 to pay off the remaining mortgage loan balance associated with Unit 601 in The Pasquale located at 132 Lakefront, Buffalo, New York 14202. |

| COUNT | DATE OF TRANSACTION | AMOUNT | DESCRIPTION OF TRANSACTION |
|-------|---------------------|--------|----------------------------|
|       |                     |        |                            |
| 17 | January 6, 2017 | $500,000 | Check 101 in the amount of $500,000 drawn on Schwab Account 2312 and made payable to Quality Product Solution LLC for the acquisition of the Promissory Note and deposited into BOA Account 4925 in the name of Quality Product Solutions LLC. |
| 18 | February 9, 2017 | $195,000 | Account transfer from Key Account 1781 to Key Account 0475. |
| 19 | March 14, 2017 | $450,000 | Wire transfer in the amount of $450,000 from Key Account 1027 to Cutaia Acquisitions LLC, Citizen's Bank Account 2083 for the acquisition of 50 membership units in Monterra Holdings, LLC. |
| 20 | December 19, 2017 | $968,795.08 | Account transfer from Schwab Account 1602 to Schwab Account 3971. |

**All in violation of Title 18, United States Code, Section 1957(a).**

## COUNT 21

**(Corruptly Altering, Destroying, Mutilating, and Concealing Evidence)**

**The Grand Jury Further Charges That:**

1.    The allegations of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.    Between on or about July 29, 2016 and in or around August 2016, the exact dates being unknown to the Grand Jury, in the Western District of New York, and elsewhere, the defendant, MICHAEL W. LUEHRSEN, did corruptly alter, destroy, mutilate, and conceal,  and attempt to alter, destroy, mutilate, and conceal, records, that is, the emails set forth in Paragraphs 13(a) through 13(f) of Count 1 of this Indictment, which concerned the marketing and reimbursement of compounded medications, with the intent to impair each email's integrity and availability for use in an official proceeding, that is, a federal grand jury proceeding.

**All in violation of Title 18, United States Code, Section 1512(c)(1).**

## COUNT 22

**(Altering, Destroying, Mutilating, Concealing and Covering Up Evidence)**

**The Grand Jury Further Charges That:**

1.    The allegations of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      Between on or about July 29, 2016, and in or around August 2016, the exact dates being unknown to the Grand Jury, in the Western District of New York, and elsewhere, the defendant, MICHAEL W. LUEHRSEN, did knowingly alter, destroy, mutilate, conceal, and cover up records and documents, that is, emails concerning the marketing and reimbursement of compounded medications, with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the United States, that is, an investigation into violations of Title 18, United States Code, Sections 1347 and 1349.

**All in violation of Title 18, United States Code, Section 1519.**

## FIRST FORFEITURE ALLEGATION

**(Proceeds Forfeiture)**

**The Grand Jury Alleges That:**

Upon conviction of the offense set forth in Count 1 of this Indictment, the defendant, MICHAEL W. LUEHRSEN, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense. The property to be forfeited includes, but is not limited to, the following:

### A.    MONETARY AMOUNT

The approximate sum of $3,345,924 which sum of money is equal to the total amount of proceeds obtained as a result of the offense for which the defendant, MICHAEL W. LUEHRSEN, is charged in Count 1.  In the event that the above sum is not available, then a money judgment for the same amount will be entered against the defendant.

**B.    REAL PROPERTY**

i.    The Premises and Real Property with Buildings, Appurtenances, and Improvements at 132 Lakefront Boulevard, Unit 601, Buffalo, New York, that is, all that tract or parcel of land, situated in the City of Buffalo, County of Erie, State of New York, and More Particularly Described in a Certain Deed Recorded in the Erie County Clerk's Office in Book 11370, Page 6848;  and

ii.    The Premises and Real Property with all Buildings, Appurtenances, and Improvements, located at 465 Brickell Avenue, Unit 5102, Miami, Florida, that is, all that tract or parcel of land, situated in the City of Miami, County of Dade and State of Florida, and more particularly described in a certain Deed Recorded in Dade County Clerk's Office Book 26656, Page 4810.

**C.    INVESTMENTS**

i.    All Contract Rights, Interest in and any Payments due on 50 Membership Units in Monterra Holdings LLC Held By Michael Luehrsen and/or YP Development, LLC;

ii.    All Contract Rights, Interest in and any Payments due on Michael Luehrsen's 10% Class A membership Interest in C3 Industries, Inc. (Formerly Quality Product Solutions, LLC, an Oregon Limited Liability Company;

iii.    All Contract Rights Interest in and any Payments due on C3 Industries, Inc. (Formerly QPS US Holdings LLC, a Delaware Limited Liability Company) Convertible Promissory Note Dated January 28, 2019; between C3 Industries Inc. (Formerly QPS US Holdings LLC) (Borrower) and Michael Luehrsen (Payee); Principal Amount, $500,000, 5.00% Annual Interest Rate;

iv.    All Contract Rights, Interest in and any Payments due on Promissory Note, Dated June 1, 2016, Between Nickel City Pictures, LLC, a Delaware Limited Liability Company (Borrower) and Michael Luehrsen (Payee); Principal Amount $450,000; And

v.    All Contract Rights, Interest in and any Payments due On Michael Luehrsen's 3% Membership Interest in Nickel City Pictures, LLC, a Delaware Limited Liability Company.

If any of the property described above, as a result of any act or omission of the

defendant:

1.    cannot be located upon the exercise of due diligence;

2.    has been transferred or sold to, or deposited with, a third person;

3.    has been placed beyond the jurisdiction of the Court;

4.    has been substantially diminished in value; or

5.    has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

**All pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c).**

## SECOND FORFEITURE ALLEGATION

**(Money Laundering Forfeiture)**

**The Grand Jury Further Alleges That:**

Upon conviction of one or more of the offenses set forth in Counts 2 through 20 of this Indictment, the defendant, MICHAEL W. LUEHRSEN, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), the following property:

### A.    PROPERTY

All right, title and interest in any and all property involved in violations of Title 18, United States Code, Sections 1956 and 1957 for which the defendant is convicted, and all property traceable to such property, including the following: 1) all money or other property or traceable to such property, that was the subject of each transaction, transmission or transfer in violation of Sections 1956 and 1957; 2) all commissions, fees and other property

constituting proceeds obtained as a result of those violations; and 3) all property or traceable to such property, used in any manner or part to commit or to facilitate the commission of those violations.

### B.   MONETARY AMOUNT

The sum of approximately $5,292,117 United States currency, which sum of money is equal to the total amount of money involved in the money laundering offenses for which the defendant, MICHAEL W. LUEHRSEN is charged.  In the event that the above sum is not available, then a money judgment for the same amount will be entered against the defendant.

### C.   SPECIFIC ASSETS

The following specific assets which have been identified as property involved in a money laundering transaction or transactions:

### 1.   INVESTMENT ACCOUNTS

    i.    All Funds on Deposit ($392,919.25) Seized from Charles Schwab & Co Inc Brokerage Account 5396-3971; Titled Michael W. Luehrsen;

    ii.    All Funds on Deposit ($377,510.90) Seized from Charles Schwab & Co Inc Sep Ira Account 9666-7759; Titled Simplified Employee Plan Of Michael W. Luehrsen Charles Schwab & Co Inc Cust Sep IRA; and

    iii.    All Funds on Deposit ($92,213.16) Seized from Charles Schwab & Co Inc. Michael W. Luehrsen Designated Bene Plan/Tod Account Number 6538-2312

### 2.   REAL PROPERTY

    i.    The Premises and Real Property with Buildings, Appurtenances, and Improvements at 132 Lakefront Boulevard, Unit 601, Buffalo, New York, that is, all that tract or parcel of land, situated in the City of Buffalo, County of Erie, State of New York, and More Particularly Described in a Certain

Deed Recorded in the Erie County Clerk's Office in Book 11370, Page 6848;

ii.    The Premises and Real Property with all Buildings, Appurtenances, and Improvements, located at 465 Brickell Avenue, Unit 5102, Miami, Florida, that is, all that tract or parcel of land, situated in the City of Miami, County of Dade and State of Florida, and more particularly described in a certain Deed Recorded in Dade County Clerk's Office Book 26656, Page 4810; and

iii.    The premises and real property with all buildings, appurtenances, and improvements, located at 1201 20th Street, Unit 209, Miami, Florida, that is, all that tract or parcel of land, situated in the City of Miami, County of Dade and State of Florida, and more particularly described in a certain Deed Recorded in Dade County Clerk's Office Book 30168, Page 4010.

3.    **INVESTMENTS**

i.    All Contract Rights, Interest in and any Payments due on 50 Membership Units in Monterra Holdings LLC held by Michael Luehrsen and/or YP Development, LLC;

ii.    All Contract Rights, Interest in and any Payments due on Michael Luehrsen's 10% Class A Membership Interest in C3 Industries, Inc. (Formerly Quality Product Solutions, LLC, an Oregon Limited Liability Company);

iii.    All Contract Rights, Interest in and any Payments due on C3 Industries, Inc. (Formerly QPS US Holdings LLC, a Delaware Limited Liability Company) Convertible Promissory Note Dated January 28, 2019; between C3 Industries Inc. (Formerly QPS Us Holdings LLC) (Borrower) and Michael Luehrsen (Payee); Principal Amount, $500,000, 5.00% Annual Interest Rate; and

iv.    All Contract Rights, Interest in and any Payments due on Michael Luehrsen's Member Interest to 3.86473% Of Class A Preferred Capital Of C3 Industries, Inc. (Formerly QPS Michigan Holdings LLC, A Michigan Limited Liability Company.

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant

1.    cannot be located upon the exercise of due diligence;

2.     has been transferred or sold to, or deposited with, a third person;

3.     has been placed beyond the jurisdiction of the Court;

4.     has been substantially diminished in value; or

5.     has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

**All pursuant to Title 18, United States Code, Section 982(a)(1) and Title 21, United States Code, Section 853(p).**

DATED:  Buffalo, New York, July 28, 2021.

JAMES P. KENNEDY, JR.
United States Attorney

BY:    S/CHARLES M. KRULY
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716-843-5838
Charles.Kruly@usdoj.gov

A TRUE BILL:

S/FOREPERSON