UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

MICHAEL W. LUERHSEN,                                    21-CR-120
                                                       DECISION & ORDER
                    Defendant.

---

On July 28, 2021, the government filed a twenty-two-count indictment against the

defendant, Michael W. Luehrsen, charging him with conspiracy to commit health care

fraud in violation of 18 U.S.C. § 1349 (Count 1) ("conspiracy charge"); money

laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Counts 2 through 9)

("concealment-money-laundering charges"); money laundering in violation of 18 U.S.C.

§ 1957(a) (Counts 10 through 20) ("transactional-money-laundering charges"); corruptly

altering, destroying, mutilating, and concealing evidence in violation of 18 U.S.C.

§ 1512(c) (Count 21); and altering, destroying, mutilating, concealing, and covering up

evidence in violation of 18 U.S.C. § 1519 (Count 22) (Counts 21 and 22, collectively,

"obstruction charges").  Docket Item 1.  The indictment also included two forfeiture

allegations.  *Id.* at 20-25.  On November 17, 2021, the government filed a superseding

indictment, which made some minor changes to the forfeiture allegations but was

otherwise identical to the original indictment.  Docket Item 46.

A jury trial commenced on January 31, 2022.  Docket Item 87.  The government

rested its case on February 17, 2022, after which Luehrsen moved for a judgment of

acquittal on all counts under Federal Rule of Criminal Procedure 29 ("Rule 29 motion").

Docket Item 120.  The Court reserved decision.  *Id.*

Luehrsen then presented his own evidence, including testifying on his own

behalf.  Docket Items 121 and 123.  On February 23, 2022, he rested his case and

renewed his Rule 29 motion.  Docket Item 123.  The Court again reserved decision.  *Id.*

The jury began deliberating on February 24, 2022.  Docket Item 125.  On March

4, 2022, after approximately a week of deliberations, the jury returned a partial verdict.

*See* Docket Items 127, 129, 131, 133, 135, 137, and 143.  More specifically, the jury

acquitted Luehrsen on ten counts—the concealment-money-laundering charges

(Counts 2 through 9) and the obstruction charges (Counts 21 and 22)—but was unable

to reach a unanimous verdict on the remaining twelve counts.  Docket Items 137 and

143.  Accordingly, the Court declared a mistrial on the conspiracy charge (Count 1) and

the transactional-money-laundering charges (Counts 10 through 20).  Docket Item 137.

Luehrsen again renewed his Rule 29 motion, and the Court again reserved decision,

this time asking the parties to brief the issues.  *Id.*

On April 4, 2022, Luehrsen filed a brief in support of his renewed Rule 29 motion,

Docket Item 148; on April 29, 2022, the government responded, Docket Item 156; and

on May 6, 2022, Luehrsen replied, Docket Item 160.  The Court heard oral argument on

May 31, 2022, and reserved decision.  Docket Item 162.

For the reasons that follow, this Court denies Luehrsen's Rule 29 motion.

**FACTUAL BACKGROUND**

The superseding indictment alleges that Luehrsen made millions of dollars by engaging in a fraudulent scheme in which he marketed and obtained prescriptions for compound medications.[1]  A compound medication is a "drug[ ] created by combining, mixing, or altering ingredients to create a medication that was tailored to the medical needs of an individual patient."  Docket Item 46 at 4.  "For example, if a patient was allergic to a specific ingredient in a Food and Drug Administration-approved medication, a compound[ ] drug could be prepared for the patient."  *Id.*  Compound medications are "not approved by the Food and Drug Administration."  *Id.*

The purpose of the alleged conspiracy was "to unjustly enrich [Luehrsen and his alleged co-conspirators] by marketing, and obtaining prescriptions for, compound[ ] medications in a manner fraudulently intended to continually maximize both the reimbursement rate and the adjudication rate of the compound[ ] medications."  *Id.* at 6. According to the indictment, "[u]nlike typical pharmaceutical sales representatives who marketed prescription drugs to physicians, [Luehrsen] and other members of the conspiracy typically targeted patients whose health insurance covered compound[ ] medications and marketed the medications directly to those patients."  *Id.* at 7. Moreover, "the compound[ ] medications marketed as part of the conspiracy were not tailored to the needs of individual patients, but were, instead, tailored to contain

---

[1]  The indictment refers to "compounded medications," but throughout the trial and in post-trial briefing, both parties referred to these drugs as "compound medications"; therefore, this Court uses the term "compound medications" in this decision.

ingredients which carried high reimbursement rates from health care benefit programs." *Id.* at 9.

Luehrsen allegedly began his scheme by "obtain[ing] a large number of high-reimbursement compound[ ] medications for himself." *Id.* at 8.  He then "recruited other individuals to join the conspiracy as representatives" and "encouraged [them] to obtain compound[ ] medications for themselves and members of their family." *Id.* at 9. Luehrsen allegedly "paid the representatives a percentage of the reimbursement that [his company, MedHype,] received for each prescription the representative marketed which was approved and filled." *Id.* at 9.

To advance this scheme, Luehrsen, "together with his associates, [allegedly] obtained compound[ ] medication prescriptions from physicians who had never examined, and who had no doctor-physician relationship with, the patients for whom they prescribed medications." *Id.* at 12.  These "medications were typically listed on pre-printed, check-the-box prescription pads, which were made available to prescribing doctors." *Id.* at 9.

Furthermore, "to conceal the fact that that many patients had not seen a physician prior to receiving a compound[ ] medication, [Luehrsen] instructed members of the conspiracy on how patients and physicians should respond to audits by [Pharmacy Benefit Managers ('PBMs')] concerning compound[ ] medication prescriptions."[2]  *Id.* at 12.  And "[w]hen PBMs did not adjudicate particular compound[ ] medications, the formulations of these compound[ ] medications were modified to

---

[2]  PBMs are companies, such as Express Scripts and CVS Caremark in this case, whose role is to approve prescription insurance claims and to detect improper claims.  *See* Docket Item 106 at 14.

ensure that the PBMs would continue to adjudicate the medications and to maximize reimbursement rates for the compound[ ] medications."[3]  *Id.* at 9-10.

At trial, the government presented testimony from a number of witnesses, including alleged co-conspirators Scott Trapp and Erik Berg.  Both Trapp and Berg testified that they marketed compound medications at Luehrsen's direction—first for themselves and then for family and friends.  *See* Docket Items 154, 155, 159.  Trapp and Berg received large commissions for those prescriptions, which were reimbursed by certain insurance companies at rates up to $14,000 per script.  *See, e.g.*, Docket Items 154 at 10-11, 32-33, 172; Docket Item 159 at 23-25.

Trapp and Berg both admitted that they and Luehrsen knew that some of these prescriptions were for patients who had never seen the prescribing doctor.  *See, e.g.*, Docket Item 154 at 23-24; Docket Item 159 at 244.  For example, Berg testified that two patients—J.W. and A.W.[4]—received prescriptions from Dr. William Stephan without seeing the doctor and thereby obtained wound creams worth more than $60,000 each month for several months.  Docket Item 159 at 244.  Trapp went even further, admitting that he obtained a blank prescription form signed by Dr. Jack Bertolino and used that form to get fraudulent prescriptions for Trapp's family and another couple, L.N. and D.N. ("the Ns").  Docket Item 154 at 20-21, 204-05, 235-36.  Trapp testified that Luehrsen knew about Trapp's using Dr. Bertolino's blank prescription and that Luehrsen told Trapp "[n]o one's ever going to find out.  It's going stay under the radar."  *Id.* at 21.

---

[3]  In this context, "adjudicate" means to approve for payment.  *See* Docket Item 159 at 179-80.

[4]  The Court refers to the individuals who received allegedly fraudulent prescriptions by their initials to protect their privacy.

Moreover, both Trapp and Berg described how Luehrsen instructed them about coordinating doctor and patient audit responses to avoid getting in trouble.  Docket Item 154 at 103-04; Docket Item 159 at 86-89.  For example, Berg testified that Luehrsen told him "exactly what Dr. Stephan had to do and what to say" so that an audit would "just go away" and not "be a problem anymore."  Docket Item 159 at 88-89.  Trapp likewise testified that Luehrsen "gave [him] the answers, how [the audit paperwork] should be filled out . . . for both Dr. Bertolino and the [Ns]."  Docket Item 154 at 104.

In addition, the government presented testimony from Dr. Nicolas Saikali who had prescribed compound medications for Luehrsen.  Docket Item 158 at 3-4.  Among other things, Dr. Saikali testified that his signature appeared to be forged on a prescription that Luerhsen had emailed to Steven Butcher, a pharmacy owner.  *See id.* at 14-20.

Luehrsen's father, Robert H. Luehrsen, Jr. ("Robert"), also testified, largely about an altered prescription signed by Dr. Paul Kuritzky that had been submitted to a pharmacy by fax.  *See* Docket Item 153.  Robert had told the grand jury that Luehrsen altered the fax, but Robert told the trial jury that he (Robert) had actually altered it.  *Id.* at 12-16.  Robert nevertheless admitted that Luehrsen had access to and used Robert's fax machine.  *Id.* at 22.

The government presented several other witnesses, including Dr. Stephan, Dr. Kuritzky, and pharmacy-owner Butcher.  *See* Docket Items 101 and 117.  In addition, the government presented testimony from several recipients of prescriptions obtained for them by Luehrsen or his associates for which the recipient never saw a doctor.  *See,*

*e.g.*, Docket Items 115 (testimony of A.W.), 118 (testimony of L.N.), and 157 (testimony of J.T.).

Finally, with respect to the transactional-money-laundering charges, the government presented testimony from a forensic accountant, Stephanie Bifano, who had analyzed MedHype's accounts.  *See* Docket Item 113.  Bifano gave detailed testimony about how she identified and traced what she deemed to be fraudulent proceeds that were used in financial transactions.  *See id.*

## DISCUSSION

## I.     LEGAL STANDARD

A defendant seeking a judgment of acquittal faces a heavy burden: A court can grant a Rule 29 motion only if no rational jury could have found beyond a reasonable doubt that the defendant was guilty.  *See United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015).  Stated another way, "[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *See United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *United States v. White,* 673 F.2d 299, 301 (10th Cir. 1982)).

If a court reserves ruling on a Rule 29 motion until after the jury has returned a verdict, it "must decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed.R.Crim.P. 29(b); *see also United States v. Velasquez*, 271 F.3d 364, 371 (2d Cir. 2001).  Here, because the Court first reserved ruling on Luehrsen's Rule 29 motion following the close of the government's case, the Court must examine

whether the government met its burden based on the trial evidence at that time.  *See*

Docket Item 148 at 3.

In conducting its analysis, the Court "must view the evidence in the light most

favorable to the government, crediting every inference that could have been drawn in

the government's favor."  *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019).

That being said, "if the evidence viewed in the light most favorable to the prosecution

gives equal or nearly equal circumstantial support to a theory of guilt and a theory of

innocence, then a reasonable jury must necessarily entertain a reasonable doubt."

*United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotations omitted).

## II.    ANALYSIS

The crux of Luehrsen's argument is that the evidence presented by the

government was "at least as consistent with innocence as with guilt."  Docket Item 148

at 4 (quoting *Pauling*, 924 F.3d at 656).  He contends that the government "failed to

present evidence of such 'a convincing character that a reasonable person *would not*

*hesitate* to rely upon' it in a matter of great personal importance."  *Id.* (emphasis in

original) (quoting Docket Item 34 [the government's proposed jury instructions] at 15).

And in Luehrsen's view, "the jury's one[-]week deliberation and the resulting partial

verdict underscores the insufficiency of the evidence the government presented at trial."

*Id.*

This Court disagrees.  Viewing the evidence in the light most favorable to the

government—as it must on a Rule 29 motion—the Court finds that the government's

proof was not "so meager that no reasonable jury could find guilt beyond a reasonable

doubt."  *See Guadagna*, 183 F.3d at 130.  Moreover, as the government observed at

oral argument, the one-week deliberation cuts both ways, as clearly at least one juror

thought the government had met its burden.  Luehrsen's Rule 29 motion therefore is

denied.

### A.    Count 1

Luehrsen focuses his argument regarding the conspiracy count on one element:

willfulness.  He contends that "[t]he government failed to prove beyond a reasonable

doubt that Mr. Luehrsen agreed to engage in any act he knew to be unlawful."  Docket

Item 148 at 6.  "At most," he argues, "the government's evidence offered the jurors the

opportunity to speculate that Mr. Luehrsen knew his conduct was unlawful."  *Id.*

To support that assertion, Luehrsen relies on testimony by his alleged

co-conspirators, Trapp and Berg, "that even *they* did not realize that they were doing

anything unlawful throughout nearly the entirety of the alleged conspiracy period."  *Id.* at

7 (emphasis in original).  More specifically, Berg testified on cross-examination that he

"did not have any major red flags" indicating that what he was doing was illegal until the

spring of 2016—near the end of the time period of the alleged conspiracy.  *Id.* at 8

(quoting Docket Item 159 at 149).  And Trapp "testified that 'the point whe[n he] knew

that [he] was involved in something illegal' was after patient D.N. received an audit from

Express Scripts *in late July 2016* and patient D.N. refused to sign it."  *Id.* at 9 (emphasis

in original) (quoting Docket Item 154 at 112).

But as the government observes, those snippets of Berg's and Trapp's testimony

cannot be examined in a vacuum.  *See* Docket Item 156 at 10.  On the contrary, they

must be viewed in the larger context of the case.  And viewed in the light most favorable

to the government, that context supports the conclusion that Berg and Trapp conspired

with Luehrsen to commit healthcare fraud.

For example, on redirect examination, Trapp explicitly testified that he and

Luehrsen had agreed to do something illegal:

> Q. . . .  And after that first meeting, did you and the
> defendant later agree to do something illegal?
>
> A. Yes.
>
> Q. Can you tell the jury what you and the defendant agreed
> to do that was illegal after that first meeting?
>
> A. Used a forged prescription, or the blank form, that Dr.
> Bertolino signed for my wife and kids, and second, to again
> use that prescription form for the two prescriptions for the
> [Ns].
>
> Q. And did you ever express[ ] concern to the defendant
> about using that blank form for your wife, your kids, and the
> [Ns]?
>
> A. Yes.
>
> Q. What did the defendant tell you when you expressed
> those concerns?
>
> A. No one's gonna find out.  Insurance companies aren't
> looking, you know, for -- for this. It'll stay under the radar.
> No one's ever gonna find out.
>
> Q. And why did you agree to go along with the defendant
> even though you had those concerns?
>
> A. Because I was greedy.  I got used to the money.

Docket Item 155 at 14; *see also* Docket Item 154 at 55 ("Q. And did you, in fact, use Dr.

Bertolino's signature or the blank form with Dr. Bertolino's signature for the [Ns]?  A. I

did.  Q. And did you know that that was wrong?  A. Yes.  Q. Why did you do it?  A.

Again, I was -- I was greedy and wanted to keep making money."); Docket Item 154 at

10

75 ("Q. And can you remind the jury how you got prescriptions for your kids?  A. I used the blank prescription form that Dr. Bertolino signed.  Q. And at whose direction did you use the blank prescription form?  A. Mike Luehrsen.").

Berg likewise testified that he understood that "it would be illegal to knowingly get commissions for prescriptions for a family . . . knowing that they'd never seen a doctor" and that at Berg's direction, Dr. Stephan "had written prescriptions for patients he [had] never seen."  Docket Item 159 at 89, 246.  According to Berg, Luehrsen knew that some individuals had received prescriptions from Dr. Stephan without having seen him.  *Id.* at 244.  Berg also admitted that coordinating knowingly false responses to audit questions was illegal, and he testified that Luehrsen had instructed him and Dr. Stephan about how to respond to an audit so that it would "just go away" and "not be a problem anymore."  *Id.* at 86-89, 248.

It is within the jury's purview to resolve inconsistencies in a witness's testimony in whatever way it sees fit.  But on this motion for a judgment of acquittal, this Court must draw all inferences in the government's favor.  And it may well be that Trapp and Berg testified that they did not know that what they were doing was illegal until late in the game because they wanted to appear less culpable before this Court, which sentenced Trapp (and likely will retain responsibility to adjudicate any violations of his conditions of supervised release after he completes his prison term) and which will sentence Berg.  Or it may be that they simply wanted to minimize their wrongdoing when testifying publicly about it.  Regardless, the testimony that Luehrsen now cites does not and cannot erase the explicit testimony of Trapp and Berg that they agreed with Luehrsen to break the law.

For that reason, in deciding this motion, this Court must credit the testimony in which Trapp and Berg admitted to agreeing with Luehrsen to engage in illegal activity—such as forging prescriptions, receiving reimbursements for prescriptions for which the doctor had not seen the patient, and coordinating audit responses.  Likewise, this Court must credit their testimony describing comments Luehrsen made about staying under the radar to avoid detection.  And that testimony alone, viewed in the light most favorable to the government, precludes the relief that Luehrsen seeks.

What is more, in addition to Trapp's and Berg's testimony, the government presented Dr. Saikali's testimony that his signature appeared to be forged on a blank prescription form that Luehrsen emailed to Butcher.  *See* Docket Item 158 at 14-20.  It is true, as Luehrsen notes, that Dr. Saikali conceded on cross-examination that he could not be "100 percent sure" that the signature was not his.  *See* Docket Item 160 at 4 (citing Docket Item 158 at 38).  But a reasonable juror might well have accepted what was clear to this Court: that Dr. Saikali was all but certain that he did not sign the prescription.  And drawing all inferences in the government's favor on this Rule 29 motion, Dr. Saikali's minimal uncertainty is not enough to undermine the rest of his testimony.

Finally, as noted above, Luehrsen's father, Robert, testified about a prescription that had been altered to add additional products after it was signed by Dr. Kuritzky.  *See* Docket Item 153 at 11-12.  Robert claimed, for the first time at trial, that he altered the script; he had told the grand jury the exact opposite—that he did not alter it.  *Id.* at 12-20.  But Robert admitted that Luehrsen had access to and used Robert's fax machine, which was used to fax the altered script to the pharmacy.  *Id.* at 22.  And as the

government observes, "[a] juror could reasonably infer that the defendant's father knew that his son had faxed an altered prescription from his home and lied to the jury in an effort to protect his son."  Docket Item 156 at 7.

In sum, this Court finds that based on the evidence the government presented, and drawing all inferences in the government's favor, a reasonable juror could find beyond a reasonable doubt that Luehrsen conspired to commit healthcare fraud. Luehrsen's motion for a judgment of acquittal on Count 1 is therefore denied.

### B.      Counts 10-20

Counts 10-20 charged Luehrsen with transactional money laundering.  Docket Item 46 at 15-18.  To convict a defendant on such a charge, the government must prove beyond a reasonable doubt that the defendant "knowingly engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property of a value greater than $10,000" and that the property was "derived from specified unlawful activity."  18 U.S.C. § 1957(a).  For the reasons that follow, this Court finds that the government's evidence was sufficient for a reasonable juror to find Luehrsen guilty on Counts 10-20.

First, as explained above, the government presented sufficient evidence for a reasonable juror to find that Luehrsen conspired with Trapp and Berg to commit healthcare fraud.  That evidence, viewed in the light most favorable to the government, showed that Trapp and Berg obtained prescriptions for various friends and family so that Trapp, Berg, and Luehrsen could obtain exorbitant reimbursements rather than based on medical need and a physician's advice.  And the evidence was sufficient to show that Luehrsen was well aware of—and, in fact, spearheaded—the scheme.

Moreover, the government presented enough proof for a reasonable juror to find that the transactions charged in Counts 10-20 were derived from that specified unlawful activity.  In that regard, the government presented testimony from a forensic accountant, Bifano, who explained that she was able to use the records of pharmacy benefits managers to identify claims paid for patients associated with Trapp, Berg, and their associates.  Docket Item 113 at 42, 46-47.  More specifically, she identified approximately $10 million in reimbursements associated with claims from Trapp, Berg, and those working under them.  *Id.* at 14.  Based on various government exhibits, Bifano determined that MedHype's commission was about half of those reimbursements.  *Id.* at 43-46; Gov. Exs. 227, 275, 278 and 219.  She therefore determined that MedHype had received approximately $5 million in reimbursements for the allegedly fraudulent prescriptions obtained by Trapp, Berg, and their associates. Docket Item 113 at 47-48.

Bifano then examined MedHype's bank accounts and determined that $1,655,986 was paid out in commissions to Trapp, Berg, and their associates.  *Id.* at 48. Accordingly, she determined that Luehrsen had retained $3,345,924 in fraudulent proceeds.  *Id.*  And she traced Luehrsen's use of those proceeds in other financial transactions—a process she described as "very time consuming" due to the commingling of funds and the frequent movement of those funds between and among different bank accounts.  *Id.* at 49-50; *see also id.* at 51 (Bifano's explaining that "there was a significant volume of transactions" and "some of the transactions were multi steps, so it wasn't a direct trace, it would go through multiple accounts").

14

Luehrsen's primary argument on these counts is that "the government failed to prove . . . that the money in . . . MedHype's accounts comprised fraud proceeds" and instead analyzed only "the flow of money *leaving* MedHype's bank accounts," which "could not alone establish [his] guilt."  Docket Item 160 at 9 (emphasis in original).  In particular, Luehrsen notes that the government failed to "provide any evidence to tie any specific funds received by MedHype to any specific prescription alleged to be illegitimate."  Docket Item 148 at 17.  In other words, Luehrsen claims that without specific tracking of payments for individual prescriptions, the jury could not have reasonably concluded that fraudulent proceeds were deposited into the MedHype account.  This Court disagrees.

Bifano testified that she was able to identify deposits from pharmacies into the MedHype accounts that funded the commission payments to Trapp and Berg.  Docket Item 113 at 79-81 ("Q. And did you then try to identify the deposit into the account that funded those proceeds [of specified unlawful activities]?  A. I did.  Q. And tell the jury about that.  What was the next step?  A. So the next step was that [I] determined what in fact funded those payments of the commissions, which would have been a payment from a pharmacy, or from a marketing arm that would pay the pharmacy -- from the pharmacy. . . . Q. So just to make sure I understand this correctly, so you know there are proceeds of health care fraud conspiracy in the account, and you see the deposit that funds those proceeds; is that correct?  A. Correct.").  Based on this testimony— combined with the evidence described above regarding Trapp's and Berg's involvement in the alleged healthcare fraud conspiracy—a jury could reasonably infer that proceeds

of the alleged conspiracy were deposited into the MedHype accounts and then used in the transactions at issue.

To be sure, a jury might also find that the absence of specific tracking of individual prescriptions created a reasonable doubt about the fraudulent nature of the funds in the MedHype accounts and therefore used in the transactions.  But for the purposes of this Rule 29 motion—on which this Court must draw all inferences in the government's favor—the government has met its burden.  And for that reason, Luehrsen's motion for a judgment of acquittal on Counts 10-20 is denied.

## CONCLUSION

For all those reasons, Luehrsen's Rule 29 motion is DENIED.  The government shall move to set a trial date, and this Court will then hold a status conference for that purpose.

SO ORDERED.

Dated:        June 29, 2022
              Buffalo, New York


                                          _/s/ Lawrence J. Vilardo_____
                                          LAWRENCE J. VILARDO
                                          UNITED STATES DISTRICT JUDGE